Lester Holtzman, J.
Defendant Qneens County Bar Association (hereinafter referred to as the Bar Association) moves for summary judgment. Plaintiff requests, in his opposing papers, that summary judgment be granted in his favor.
Plaintiff commenced this action against the Bar Association and the Honorable George W. Herz on October 28, 1963, seeking “ to permanently enjoin the ‘ Bar Association ’ from effectuating and carrying forward the alleged ‘ Queens Plan ’ and further restraining the defendant Host. George W. Herz, from taking any step or steps to effectuate and utilize the endorsement of his candidacy by the ‘ Bar Association ’ through its ‘ Queens Plan
Simultaneously with the service of a summons and complaint in this action, plaintiff, as petitioner, commenced an article 78 proceeding against the same defendants, as respondents, in which he sought substantially the same relief that he seeks in this action. Argument in that proceeding was heard by Mr. Justice Damiakt on October 30, 1963, during which petitioner withdrew his application as against Mr. Justice Herz and announced his intention to proceed only against the Bar Association. Election day in 1963 was on November 5. In a decision which appeared in 40 Miscellaneous 2d 840, Mr. Justice Damiani dismissed the petition, stating that he doubted whether an article 78 proceeding was maintainable for the purposes sought and that since the issue involved appeared to be one of first impression in this State and of considerable importance to the Bench, the Bar and the public, petitioner should be relegated to Ms *532 plenary suit, which was then pending, where the novel issue might be more appropriately litigated.
In his brief, plaintiff argues that the Bar Association’s “ Queens Plan” activity (1) violates section 671 of the Penal Law, (2) is ultra vires and violates the Bar Association’s charter and the Membership Corporations Law, (3) violates sections 320, 321, 322 and 323 of the Election Law, and (4) violates the Tax Law and Beal Property Law.
In its brief, the Bar Association addresses itself to its power to adopt and implement its “ Queens Plan ” and to section 671 of the Penal Law.
This court is convinced that the Bar Association’s adoption of the “ Queens Plan” and the activity taken to implement that plan were neither ultra vires nor in violation of any statute. That no ultra vires conduct is here involved seems clear.
Subdivision 7 of section 11 of the Membership Corporations Law provides that: “ The corporate purposes of a bar association shall be cultivating the science of jurisprudence, promoting reforms in the law, facilitating the administration of justice, elevating the standard of integrity, honor and courtesy in the legal profession, cherishing the spirit of brotherhood among the members thereof, and such kindred purposes as may be stated in the certificate. The incorporators shall be members of the bar in active practice.”
Canon 2 of the Canons of Professional Ethics, entitled 1 ‘ The Selection of Judges ”, provides that: “ It is the duty of the Bar to endeavor to prevent political considerations from outweighing judicial fitness in the selection of Judges. It should protest earnestly and actively against the appointment or election of those who are unsuitable for the Bench; and it should strive to have elevated thereto only those willing to forego other employments, whether of a business, political or other character, which may embarrass their free and fair consideration of questions before them for decision.”
The certificate of incorporation of the Bar Association, as amended on July 17, 1924, states, as one of its purposes: “ To increase its usefulness in promoting a new [due] administration of justice ’ ’.
Section 14 of Article X of the Bar Association’s by-laws, as amended on October 10, 1960, provides, as to its Committee on Judiciary, that “ (a) It is charged, by such means as it may consider suitable, subject to the approval of the Board of Managers, to secure the election or appointment of competent and properly qualified candidates, to prevent the nomination, election or appointment of unfit candidates; and to prevent political *533 considerations from outweighing fitness in the selection of candidates for judicial office or for the office of District Attorney of Queens County, or for any other office connected with the administration of justice in the Court of Appeals, in the New York Court of Claims, and in all courts functioning in the County of Queens. It shall also consider the fitness of candidates proposed for nomination, appointment or election to any of the offices above referred to. * * * It may, subject to the approval of the Board of Managers, confer on the subject with other organizations, with nominating conventions or committees, and with political organizations, and in case of candidates for appointment to any such office, with the public officer in whom the power of appointment is vested.”
Then came the Bar Association’s so-called “ Queens Plan ” for the selection of Judges. That plan was adopted by the membership at a meeting held on June 10, 1963 and, except for two amendments, was published in the May, 1963 issue of the Queens Bar Bulletin (pp. 199-202). The amendments appeared in the October, 1963 issue (p. 13).
That plan was adopted ‘ ‘ In order to improve the methods of selecting judges.” It set forth minimum qualifications for all Judges and the methods of evaluating candidates for appointment to judicial office and for election to such office. The plan set forth in detail the procedure for a secret vote by the membership as to incumbent Judges seeking re-election and nonincumbent candidates for judicial office. In the first instance, as to incumbent Judges, but one question was to be submitted to the membership: “ Upon his record, does - merit re-election?” If 80% or more of the ballots cast answered that question in the affirmative, the incumbent was thereafter to be indorsed by the association; if not, he was thereafter to be evaluated in the same manner as nonincumbents.
As to the latter, detailed provision was made for a form of secret ballot, for tabulation of the votes by one or more certified public accountants retained for such purpose by the Committee on Judiciary, and for the indorsement of the candidates. A candidate receiving an over-all score of 65 points was to be indorsed by the Bar Association if he received a certain minimum number of points on two of the questions (i.e., those pertaining to integrity and legal ability), and at least 50% “ Yes ” votes of all the highest number of votes cast for any candidate on each question.
Then, crucially, the plan provided (art. Y, subd. [E]): “ The Association shall generally publicize the results of such vote and, in the event that it shall endorse but one candidate for any *534 judicial office, it shall actively campaign for the election of such candidate. ’ ’
In 1963, of the candidates nominated for the office of Justice of the Supreme Court for the Eleventh Judicial District, only one, the Honorable George W. Herz, then an appointed Justice of the Supreme Court, was indorsed by the Bar Association. Thereupon, pursuant to a resolution passed by its membership, the Bar Association appropriated $2,500 (out of its total income of $57,925 in that fiscal year) principally to defray the expenses for the following purposes: (1) conducting a judicial referendum within the Bar Association; (2) printing 100,000 handbills, which were distributed to the public commencing on October 26, 1963; and (3) newspaper advertisements announcing the Bar Association’s indorsement of the Honorable George W. Herz.
The due administration of justice depends in no small measure upon the quality of the men and women who comprise the Bench and the Bar. One of the corporate purposes of a bar association specifically prescribed by statute (Membership Corporations Law, § 11, subd. 7) is to facilitate the administration of justice. And canon 2 of the Canons of Professional Ethics affirmatively places upon the Bar the duty of earnestly and actively participating in the appointment or election of Judges. A prime corporate purpose of the Bar Association here is to increase its usefulness in promoting the due administration of justice. The “ Queens Plan ” and the implementing activity of the Bar Association in this case may prove to be wise or unwise, effective or ineffective, but wisdom and effectiveness have nothing to do with power. And if there is any doubt of the power of the Bar Association to have acted as it did, and the court has none, such doubt should be resolved in favor of the Bar Association. (Clarke v. American Press Assn., 145 Misc. 370, 372; see 6 Fletcher, Corporations, § 2486, p. 265.)
No.r has the Bar Association violated section 671 of the Penal Law, or any other statute.
Subdivision 1 of section 671 provides as follows: “No corporation or joint-stock association doing business in this state, except a corporation or association organized or maintained for political purposes only, shall directly or indirectly pay or use or offer, consent or agree to pay or use any money or property for or in aid of any political party, committee or organization, or for, or in aid of, any corporation, joint-stock or other association organized or maintained for political purposes, or for, or in aid of, any candidate for political office or for nomination for such office, or for any political purpose whatever, or for the reimbursement or indemnification of any person for moneys or prop *535 erty so used. Any officer, director, stockholder, attorney or agent of any corporation or joint-stock association which violates any of the provisions of this section, who participates in, aids, abets or advises or consents to any such violation, and any person who solicits or knowingly receives any money or property in violation of this section, shall be guilty of a misdemeanor and punishable by imprisonment in a penitentiary or county jail for not more than one year and a fine of not more than one thousand dollars.”
The broad language of the first sentence of that subdivision, literally and casually read, would seem to support plaintiff’s position. But a close reading of the statute in the light of two cardinal principles of statutory construction points the other way. Those principles are: “ In construing statutory provisions, the spirit and purpose of the statute and the objectives sought to be accomplished by the legislature must be borne in mind. ‘ The legislative intent is the great and controlling principle. Literal meanings of words are not to be adhered to or suffered to “ defeat the general purpose and manifest policy intended to be promoted ”.’ (People v. By an, 274 N. Y. 149, 152 * * *.) (Matter of New York Post Corp. v. Leibowitz, 2NY 2d 677, 685; see, also, Matter of Capone v. Weaver, 6 N Y 2d 307, 309.) “ Statutes which are penal in character must be narrowly and strictly construed and in manner not to embrace cases which do not clearly fall within their terms * * *. ‘ Acts otherwise innocent and lawful, do not become crimes, unless there is a clear and positive expression of the legislative intent to make them criminal ’ * * (People v. Benc, 288 N. Y. 318, 323.)
Legislative intent “ ‘ is to be collected from the context, from the occasion and necessity of the law, from the mischief felt, and the objects and the remedy in view’.” (People v. Bell, 306 N. Y. 110, 113.) “Acts of the Legislature which are directed against known and stated evils are not to be stretched to cover situations having no real or reasonable relation to those evils * * * especially when to do so would render the statute unconstitutional.” (People v. Bell, supra, p. 114.)
The showing made by the Bar Association on this motion convinces this court that the legislative purpose in enacting what was to become section 671 of the Penal Law was to eliminate political influence secured through financial contributions by large corporations and insurance trusts. While the newspaper articles quoted in the Bar Association’s papers are not, technically, evidence of the matters contained therein, it would be most unrealistic for the court not to note the unchallenged, apparently *536 responsible reports of blatant vote-buying by large corporations at that time. (Cf. Aldrich v. City of New York, 208 Misc. 930, 936, affd. 2 A D 2d 760.)
Section 671 should not, of course, be so narrowly construed as to thwart the commendable purpose for which it was enacted. The Bar Association’s own statement of that purpose defeats their argument that a judicial office is not a political office within the meaning of that section. A judicial office requires the protection from improper political influence sought to be afforded by that section at least as much as any executive or legislative office.
In the same vein, this court is not prepared to hold, nor does it find it necessary to hold, that no membership corporation could run afoul of that statute. (See, as to the General Corporation Law of 1890, the statute [as amd. by L. 1906, ch. 239, § 1] from which section 671 of the Penal Law eventually evolved, Matter of Ringler & Co., 204 N. Y. 30, 40.) The court does hold that on the facts involved in this action the Bar Association did not.
It is inconceivable that the Legislature would, on the one hand, prescribe that one of the corporate purposes of a bar association shall be to facilitate the administration of justice (Membership Corporations Law, § 11, subd. 7) and then, on the other hand, make criminal (Penal Law, § 671, subd. 1) the activity which was designed to effectuate that purpose.
The Bar Association’s activity was for a “ political purpose ” only in the very narrow sense that a candidate for judicial office in this State may be said to be a candidate for political office. But the Bar Association’s indorsement does not refer to any political party and the Bar Association is obligated to campaign actively for the election of any judicial candidate who alone is indorsed, whatever his political-affiliation. To say, under such circumstances, that the Bar Association used its money for or in aid of a candidate for political office or for any political purpose whatever, within the meaning of a criminal statute, would be completely to ignore the professional duty to the public which the Bar Association was attempting to discharge.
Aside from the foregoing, even momentary reflection as to the results possible under a contrary interpretation of the statute lends support to the conclusion reached. For example, a literal interpretation would render criminal the activity of newspaper and religious corporations which “ directly or indirectly ” frequently ‘1 pay or use ’ ’ their 1 ‘ money or property for or in aid of” candidates “ for political office or for nomination for such office ”. But that would stifle expression which is constitu *537 tionally protected. This court can give the statute no such meaning or effect. (People v. Bell, 306 N. Y. 110, 114, supra.)
In view of the foregoing disposition of plaintiff’s first two arguments, his remaining arguments necessarily fall.
Accordingly, the Bar Association’s motion for summary judgment is granted.