Donald E. **SCHWARTZ**, as the General Guardian for Pamela B. Schwartz, a Minor, in a derivative capacity as a shareholder of American Telephone and Telegraph Company, Plaintiff,

v.

**H. I. ROMNES et al., Defendants.**

**No. 72 Civ. 3196.**

United States District Court,
S. D. New York.

March 26, 1973.

Norwick, Raggio & Jaffe, New York City, for plaintiff.

Davis, Polk & Wardwell, New York City, for the individual defendants; Lawrence E. Walsh, Philip C. Potter, Jr., and George A. Bermann, New York City, of counsel.

Royall, Koegel & Wells, New York City, for defendant Yes for Transportation; Richard N. Winfield and James M. McMahan, New York City, of counsel.

Kenneth J. Lucey, New York City, for defendant New York Telephone Co.

John S. Luckstone, New York City, for defendant American Telephone and Telegraph Co.

ROBERT L. CARTER, District Judge.

## OPINION AND ORDER

The plaintiff moves as a shareholder of American Telephone and Telegraph Company (ATT) to compel the return of $50,000.00 which New York Telephone Company (N.Y. Telephone), a wholly-owned subsidiary of ATT, contributed to "Yes for Transportation" (YFT), a not-for-profit corporation. It is admitted that the $50,000.00 was "intended for use and was used by said corporation in effectuating the corporate purpose of Yes for Transportation . . . which included support for the approval of the transportation bond issue which ap-

peared as a proposition on the election ballot on November 2, 1971." (Affidavit of Kenneth J. Lucey, dated September 8, 1972.)

The plaintiff contends that the contribution was unlawful in that it was prohibited by § 460 of the New York Election Law, McKinney's Consol.Laws, c. 17, and § 107 of the New York Public Service Law, McKinney's Consol.Laws, c. 48. He further contends that in authorizing the payment the directors of N.Y. Telephone breached their duty to conduct the corporation's business in a lawful manner, and that this breach gave rise to a right of action on the part of the shareholder.

The defendants claim that the contribution was lawful and that its prohibition would be unconstitutional; that there is no "private right of action" under which the shareholder may challenge the expenditure; and that the plaintiff failed to meet the demand requirements of Rule 23.1 of the Federal Rules of Civil Procedure. Each of them has defended the expenditure without alleging any distinction between the responsibilities of the various classes of defendants.

I find that the directors and officers of N.Y. Telephone and ATT are liable for the unlawful use of corporate funds for a political purpose. Plaintiff is granted summary judgment as to those defendants. However, plaintiff has failed to establish that defendant YFT has acted unlawfully or that it had, or breached, any duty to the shareholders of ATT. Therefore, YFT's motion for summary judgment in its favor is granted.

## § 460 OF THE NEW YORK ELECTION LAW

§ 460 provides that:

"No corporation or joint-stock association doing business in this state, except a corporation or association organized or maintained for political purposes only, shall directly or indirectly pay or use or offer, consent or agree to pay or use any money or property for or in aid of any political party, committee or organization, or for, or in aid of, *any corporation, joint-stock or other association organized or maintained for political purposes*, or for, or in aid of, any candidate for political office or for nomination for such office, *or for any political purpose whatever*, or for the reimbursement or indemnification of any person for moneys or property so used. Any officer, director, stockholder, attorney or agent of any corporation or joint-stock association which violates any of the provisions of this section, who participates in, aids, abets or advises or consents to any such violation, and any person who solicits or knowingly receives any money or property in violation of this section, shall be guilty of a misdemeanor." (emphasis added)

The only reported judicial interpretation of this statute is found in Pecora v. Queens County Bar Association, 46 Misc.2d 530, 260 N.Y.S.2d 116 (Sup.Ct., Queens Co., 1965). In that action the plaintiff sought to enjoin the Bar Association from endorsing judicial candidates found by it to be "qualified." The endorsement was alleged to be both ultra vires and unlawful. The court first found that the endorsement of judicial candidates was not only within the corporate powers of the Bar Association, but specifically sanctioned and encouraged by § 11(7) of the Membership Corporations Law (setting forth the corporate purposes of a bar association), Canon 2 of the Canons of Professional Ethics, Judiciary Law Appendix (stating the duty of the Bar to support the election or appointment of suitable judicial candidates) and the by-laws of the Bar Association.

With regard to the claim of unlawfulness, the court found that the statute, viewed in light of its purpose—the elimination of "political influence secured through financial contributions by large corporations and insurance trusts" (260 N.Y.S.2d at 122)—should not be held to prohibit bar association endorsement of

judicial candidates. The court had some difficulty in getting around the broad language of the statute. It was, thus, careful to limit its decision to the facts before it:

"The Bar Association's activity was for a 'political purpose' only in the very narrow sense that a candidate for judicial office in this State may be said to be a candidate for political office. But the Bar Association's endorsement does not refer to any political party and the Bar Association is obligated to campaign actively for the election of *any* judicial candidate who alone is endorsed, *whatever his political affiliation*. To say, under such circumstances, that the Bar Association used its money for or in aid of a candidate for *political* office or for any *political* purpose whatever, within the meaning of a criminal statute, would be completely to ignore the professional duty to the public which the Bar Association was attempting to discharge.

"Aside from the foregoing, even momentary reflection as to the results possible under a contrary interpretation of the statute lends support to the conclusion reached. For example, a literal interpretation would render criminal the activity of newspaper and religious corporations which 'directly or indirectly' frequently 'pay or use' their 'money or property for or in aid of' candidates 'for political office or for nomination for such office.' But that would stifle expression which is constitutionally protected. This court can give the statute no such meaning or effect." 260 N.Y.S.2d at 123.

The plaintiff has focused on the *Pecora* finding that the purpose of § 460 was "to eliminate political influence secured through financial contributions by large corporations," and defendants have focused on the court's attempt to characterize the Association's activity as not being for a "political purpose." In my judgment the *Pecora* court correctly described one of the principal purposes of § 460, but its interpretation of the phrase "political purpose" does not preclude a finding that the section was meant to prohibit contributions made to influence the outcome of referenda. See Smith v. Higinbothom, 187 Md. 115, 48 A.2d 754 (1946), in which it was held that a statute which explicitly prohibited a corporation from contributing "directly or indirectly . . . to aid, promote or influence the success or defeat [of any candidate, or] of any measure or proposition submitted to a vote at a public election . . . [Acts of 1945, Ch. 934, Sec. 157]" (cited at p. 759) was inapplicable to a Bar Association which collected voluntary contributions with which it disseminated literature in support of "sitting judges" who were opposed in their bids for reelection.

Much of defendants' argument that support of the transportation bond issue was not "political" rests upon their interpretation of Olivieri et al. v. YFT (Sup.Ct., N.Y.Co., 23408/71). The *Olivieri* case involved an attempt to require YFT to file a report of campaign receipts, expenditures and contributions in accordance with § 321 of the Election Law. § 321 applies only to expenditures by a "political committee" as that term is defined in § 320:

"The term 'political committee,' under the provisions of this article, means any committee or combination of three or more persons co-operating to aid or to promote the success or defeat of a political party or principle, or of any proposition submitted to vote at a public election; or to aid or take part in the election or defeat of a candidate for public office or to aid or take part in the election or defeat of a candidate for nomination at a primary election or convention, including all proceedings prior to such primary election, or of a candidate for any party position voted for at a primary election, or to aid or defeat the nomination by petition of an independent candidate for public office; but nothing in this article shall apply to any committee or organization for the discussion or advancement of political

questions or principles without connection with any election or to a national committee organized for the election of presidential or vice-presidential candidates."

The *Olivieri* complaint was dismissed on the strength of the New York Court of Appeals ruling in Vannier v. Anti-Saloon League, 238 N.Y. 457, 144 N.E. 679 (1924) that a corporation was not a "committee" within the meaning of §§ 320 and 321.[1] The question of whether YFT was a "political committee" or a corporation organized to influence the outcome of an election has no bearing on the liability of N.Y. Telephone for its contribution to the YFT effort. It must also be noted that the language of § 320 makes clear the legislature's intention that the Election Law regulate contributions "to promote the success or defeat of . . . any proposition submitted to vote at a public election."

No New York court has decided whether § 360 prohibits corporate contributions to influence the outcome of referenda, but I have found no New York case which would be inconsistent with such a decision.

The New York legislature has provided an elaborate scheme for regulating corporate efforts to affect decisions of the legislature. New York Legislative Law § 66. If § 360 were found to be inapplicable to corporate efforts to affect the "legislative" determinations of the electorate, this area of corporate activity would, as far as I can determine, remain wholly unregulated.

### The Decisions of other States

Political contributions by corporations are prohibited in 30 states.[2] In several of these states courts have been called upon to decide whether the prohibition extended to contributions intended to affect the outcome of referenda.

The Supreme Court of Michigan was called upon to interpret a Corrupt Practices Act which related generally to candidates and political committees formed in their behalf, but also provided that—

"No officer, director, stockholder, attorney, agent or any other person,

---

1. The *Vannier* court made it clear that a corporation is subject to liability under the present § 360 (which was then § 44 of the General Corporation Law), and under § 322 of the Election Law, for participation in the electoral process:

"Nor do these views by any means lead to the conclusion that this appellant corporation is immune from any regulation or supervision of its conduct in connection with elections. We think the evidence amply justified the finding that it had gone beyond the activities for which it was organized, and that it had collected and expended money for the purpose of influencing elections and that under the management of its former superintendent there were occasions when it did not hesitate to expend money in one form or another to encompass the defeat of those who incurred its disapproval. Such conduct places it between two statutes to one of which at least it must yield obedience. Section 44 of the General Corporation Law . . . prohibits any corporation except one organized or maintained for political purposes only to 'directly or indirectly pay or use or offer, consent or agree to pay or use any money or property for or in aid of any political

party, committee or organization, * * * or for, or in aid of, any candidate for political office or for nomination for such office, or for any political purpose whatever.' Of course this corporation insists that it was not organized 'for political purposes only' and, therefore, on its own claim is not exempt from the provisions of that statute. But if, in some manner, it should be held that it might expend money in connection with elections to promote the success or defeat of political parties or to aid or influence the election or defeat of candidates, we think it would encounter the provisions of section 322, subdivision 2, Election Law [regulating expenditures by persons and entities other than 'political committees].'" (238 N.Y. 457, at 464–465, 144 N.E. 679 at 682.)

2. A. Reitman and R. Davidson, The Election Process: Voting Laws and Procedures (1972). The Oregon statute applies only to certain corporations; the Illinois statute only to insurance companies and the New Jersey statute only to insurance companies, *public utilities* and banks.

acting for any corporation or joint stock company, whether incorporated under the laws of this or any other state or any foreign country, except corporations formed for political purposes, shall pay, give or lend, or authorize to be paid, given or lent, any money belonging to such corporation to any candidate or to any political committee for the payment of *any election expenses whatever*." (Publ. Acts 1913, No. 109 § 14) (emphasis added).

The terms "political committee" and "committee" were defined in the Act as applying to—

"every combination of two or more persons who shall aid or promote the success or defeat of a candidate, or a political party or principle or measure."

In holding that the Act prohibited corporate contributions to support or defeat referenda and upholding a criminal conviction for its violation, the court said:

"That partisan zeal and spirit are as intense when canvassing and voting upon the question of local prohibition of the liquor traffic, as when canvassing and voting for candidates for office, is too evident to need discussion."

\* \* \* \* \* \*

"When the word 'political' is used as it is in this act, even if held to qualify the words 'principle or measure,' it is a narrow construction to hold that it applies to one or more of the recognized political parties only. The word has a much broader meaning, and often refers to matters of public policy." People v. Gansley, 191 Mich. 357, 158 N.W. 195 (1916), at 158 N.W. 197–198.

With regard to the defendant's claim that the statute as applied, violated the Fourteenth Amendment, the court stated:

"The Lansing Brewing Company was created under our statute, for the purpose of manufacturing beer. The privilege was not conferred upon it of

using its funds for the purpose of influencing public sentiment in connection with any election. It is probable that the Legislature had in mind the fact that it is a matter of history that corporations have in many instances used their funds . . . to influence elections, and that body believed that such practice was an abuse and menace to good government, which it sought to remedy by this legislation. The record, in our opinion, is a justification for the legislation complained of. We agree with counsel for the people wherein they say:

'If the respondent in this case, or the stockholders and officers of the Lansing Brewing Company desired, as individuals, to contribute to the campaign fund, it was their privilege so to do, subject to the regulations imposed by the statute. This artificial person, however, that was created for the purpose of manufacturing beer, has no such right; and it lies within the power of the Legislature of this state to say that its funds should not be used for such a purpose.' " (158 N.W. 195 at 201.)

State v. City of Cleveland, 33 N.E.2d 35 (Ct. of Appeals, Cuyahoga Co., Ohio, 1940) interpreted an analogous statute which provided that "[n]o person in the classified service of the city \* \* \* shall take part in a political campaign." The statute was held to include "any purpose to be attained at an election whether the voters at such election are asked to vote on issues or for or against candidates."

State ex rel. Corrigan v. Cleveland-Cliffs Iron Co., 169 Ohio St. 42, 157 N. E.2d 331 (1959) involved the following statute:

"No corporation engaged in business in this state shall, directly or indirectly, pay, use, offer, advise, consent, or agree to pay or use the corporation's money or property for or in aid of a political party, committee, or organization, or for or in aid of a candidate

for political office, or for a nomination thereto or use such money or property for any other partisan political purpose or violate any law requiring the filing of an affidavit respecting such use of such funds." Section 3599.03, Revised Code.

Noting that "[a]ll reasonable doubts in the interpretation of a criminal statute should be resolved in favor of the accused," the Court concluded that—

". . . the words 'partisan political purpose' as used in Section 3599.-03, Revised Code, do not include a purpose merely to advocate the adoption of a constitutional amendment or the passage of a bond issue or of a tax levy; and a committee organized for such purpose is not, within the meaning of that statute, a 'political party, committee, or organization.'" (157 N.E.2d 331, at 334).

Significantly, the court relied upon the fact that the phrase "for any other partisan political purpose" had been substituted by amendment for the phrase "for any political purpose whatever."

■ I find that the phrase "any political purpose whatever" unambiguously includes an effort to influence the outcome of a vote on a question or proposition. See, contra, State v. Terre Haute Brewing Co., 186 Ind. 248, 115 N.E. 772 (1917). But see State v. Fairbanks, 187 Ind. 648, 115 N.E. 769 (1917). See also, State ex rel. Nybo v. District Court of First Judicial District, 492 P.2d 1395 (Sup.Ct.Montana, 1972).

*The Free Speech Issue*

Defendants have contended, but have not persuaded this court, that § 460 cannot constitutionally prohibit corporate expenditures in support of public propositions.

The United States Supreme Court has questioned the constitutionality of a federal statute which would prohibit corporations from publishing, in the regular course of business, advice to its members, shareholders or customers regarding the effect of the adoption of political propositions. United States v. Congress of Industrial Organizations, 335 U.S. 106 at 121, 68 S.Ct. 1349, 92 L.Ed. 1849 (1948). However, the constitutional standard in this area falls far short of invalidating a statute which would prohibit the use of corporate funds to support the efforts of a second corporation campaigning among the general public to affect the outcome of an election.

■■ In enacting corrupt practices legislation, the United States Congress and the various state legislatures have sought to protect the elective process from the undue influence which corporations might exercise through financial contributions. In addition, they have sought to prevent corporate officials from devoting the assets of a corporation to political causes with which its shareholders might not agree. See United States v. Congress of Industrial Organizations, *supra*, at p. 113, 68 S.Ct. 1349. These overriding governmental interests are sufficient to justify the regulation of corporate participation in electioneering efforts. It is unnecessary here to measure the governmental interest against the rights of individuals, of non-profit organizations, or of corporations chartered to engage in political or quasi-political activities. This court is persuaded that the legislative purposes outlined above justify restriction of the rights of a public utility to engage in political advocacy, and that no constitutional infirmity is present. See United States v. First National Bank of Cincinnati, D.C., 329 F.Supp. 1251, discussion at p. 1254.

■ § 107 OF THE PUBLIC SERVICE LAW

§ 107 provides that

"Except with the consent and approval of the public service commission first had and obtained, no public utility shall use revenues received from the rendition of public service within the state for any purpose other than its operating, maintenance and depreciation expenses, the construc-

tion, extension, improvement or maintenance of its facilities and service, the payment of its indebtedness and interest thereon, and the payment of dividends to its stockholders."

I have found no judicial interpretation of the law. The chairman of the Public Service Commission stated in a letter dated January 25, 1972 (Exhibit C of the affidavit of H. Miles Jaffe, dated September 28, 1972), that the contribution in question here was not reported, and should not have been reported, as an operating expense. Defendants have not alleged Commission approval. It is, therefore clear that the letter of § 107 has been violated. Defendants argue that the statute was intended to "prevent operating companies from diverting their funds to recoup the losses of their affiliated companies" (memorandum of defendants de Butts et al., at p. 23, citing an Annual Report of the Public Service Commission). There is no reason, however, to assume that this was the sole purpose of the legislation.

## PLAINTIFF'S RIGHT OF ACTION

Cases have been brought by shareholders or members in other states to challenge the legality of corporate expenditures for political purposes. Smith v. Higinbothom, *supra*, was brought by a member of the Bar Association. Lustwerk v. Lytron, 344 Mass. 647, 183 N.E.2d 871 (1962), involved violation of the Massachusetts Corrupt Practices Act. The court reported that—

"the bill adequately avers that Lustwerk, as a stockholder, and Lytron, as a corporation, are aggrieved by the proposed expenditure alleged to be ultra vires" * 183 N.E.2d at 872–873.

In this case, however, we must apply the law of New York. I am persuaded by a review of analogous cases that New York courts would entertain this action. Abrams v. Textile Realty Corporation et al., 97 N.Y.S.2d 492 (Sup.Ct., N.Y.Co.

1949) involved the allowance of attorneys' fees for a shareholder's derivative action. The court said that

"At common law a stockholder may sue in the corporation's behalf to restrain its commitment to an ultra vires act, and such restraint is deemed in law to be protection of and beneficial to the corporation and its stockholders and creditors under Articles 6 and 6–A of the General Corporation Law and under the common law. Those who have a legal interest in the corporation have a right to judicial protection against such commitment irrespective of whether those hazards of the extra-legal action may be deemed negligible, or proper calculated risks, or counter-balanced by desirable ends." 97 N.Y.S.2d at 495.

In Abrams v. Allen et al., 297 N.Y. 52, 74 N.E.2d 305 (1947), the New York Court of Appeals reversed the dismissal of a shareholder's complaint which alleged that the defendant corporation had closed a plant in order to intimidate its employees. The court said:

"If the averments of fact . . . are proven on the trial, they may be held to have amounted to actionable breaches of the duties owned by defendants to the corporation, as its trustees and agents. Depending on circumstances, they may fall into one or more of the categories of acts for which directors are liable in damages, among which are

\* \* \* \* \* \*

using the corporation's property for the doing of an unlawful or immoral act, Bath Gas Light Co. v. Claffy, 151 N.Y. 24, 45 N.E. 390." 297 N.Y. at 55–56, 74 N.E.2d at 306.

Similarly, Murrin v. Archbald Consolidated Coal Company et al. (1921), 232 N.Y. 541 said, at p. 543, 134 N.E. 563, at p. 564:

"If the act of the corporation was *ultra vires*, it was a breach of the im-

---

* The term "ultra vires" is frequently used loosely to mean both illegal and unauthorized corporate activity. In all the cases cited herein illegal conduct was involved.

**38**

plied contract between it and its stockholders which they might resist."

## DEMAND

 Rule 23.1 provides that the complaint in a derivative action—

"shall . . . allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for his failure to obtain the action or for not making the effort."

This complaint alleges a demand by others and the futility of a further demand. It is admitted that a demand was made by the Project on Corporate Responsibility in a related case and that defendants refused to act upon it. Plaintiff's counsel describes the subsequent events as follows:

"After this refusal I as counsel commenced suit against the defendants herein by way of the companion case, Project on Corporate Responsibility v. Romnes (72 Civ. 1384). Subsequent investigation revealed that Project had purchased its stock after the date of the transaction involved. As counsel for the Project on Corporate Responsibility, a public interest group seeking to establish guidelines on corporate responsibility, I began discussions with the defendants' attorney, Mr. Philip C. Potter, of Davis, Polk & Wardwell, who has submitted an opposing affidavit here, to arrange for a substitution of plaintiffs. Mr. Potter and I had several discussions, some of which related to the substance of this case. On behalf of his clients, the directors of the two companies, Mr. Potter refused to allow a substitution of plaintiffs and told me that should Project wish to take further action it should recommence suit. At no time during these discussions with Mr. Potter was it ever suggested that the companies or its directors were not committed to the rationale given in the letter of its General Solicitor.

"The tenor of negotiations with Mr. Potter, the nature of Mr. Dixon's response to the letter of Project, the response of the corporation and its directors to the companion suit here all indicate definitively that a further demand would have been laughable and unavailing as alleged in the complaint." (Affidavit of H. Miles Jaffe, dated September 28, 1972, p. 2.)

It may be that the *complaint* should have stated these facts "with particularity," but I see no merit in defendants' claim that the justification for failure to make the demand is legally insufficient.

So ordered.